400 F.2d 806
 John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
James M. PENNINGTON et al., Defendants,
CrossPlaintiffs-Appellants,
v.
UNITED MINE WORKERS
OF AMERICA, Cross Defendant-Appellee.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
James M. PENNINGTON, et al., Defendants, Cross
Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF
AMERICA, Cross Defendant-Appellant.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
Harry P. STANSBERRY, Individually and t/a Stansberry Coal
Company, Defendants, Cross Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF AMERICA, Cross
Defendant-Appellant.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
Jesse C. FESLER and Nola Fesler, Individually and t/a Fesler
Coal Company, Defendants, Cross
Plaintiffs-Appellees,
v.
UNITED MINE
WORKERS OF AMERICA, Corss
Defendant-Appellant.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
U. R. ARNOLD and Mrs. U. R. Arnold, Individually and t/a
Arnold Strip Mining Company, a Partnership, and The Arnold
Coal Company, Inc., Defendants, Cross Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF AMERICA, Cross Defendant- Appellant.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
TENNCO, INCORPORATED, Defendant, Cross Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA, Cross
Defendant-Appellant.
John L. LEWIS, Josephine Roche and Henry G. Schmidt, As
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Plaintiffs,
v.
E. C. McPHERSON, Individually and t/a E. C. McPherson Coal
Company, M. W. Norquest and E. C. McPherson, Individually
and t/a McPherson Coal Company, Defendants, Cross
Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF AMERICA,
Cross Defendant-Appellant.
DEAN COAL COMPANY, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.
W. R. PARTON d/b/a W. R. Parton Coal Company, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.
 Nos. 17445-17453.
 United States Court of Appeals Sixth Circuit.
 Sept. 11, 1968, Certiorari Denied Dec. 9, 1968, See 89 S.Ct.
450.
 
 John A. Rowntree, Knoxville, Tenn., for Dean Coal Co. and W. R. Parton; Robert S. Young, Jr., Knoxville, Tenn., on the brief; Fowler, Rowntree, Fowler & Robertson, McCampbell, Young & Bartlett, Knoxville, Tenn., of counsel.
 Harrison Combs, Washington, D.C., Edward L. Carey, Willard Owens, Washington, D.C., E. H. Rayson, Knoxville, Tenn. and M. E. Boiarsky, Charleston, W. Va., for United Mine Workers of America.
 Before EDWARDS, PECK and COMBS, Circuit Judges.
 No. 17445
 PECK, Circuit Judge.
 
 
 1
 The complicated factual pattern of this case and its protracted history in the courts are fully reported in an opinion in this Court on a previous appeal,[1] in the opinion of the Supreme Court[2] reversing our earlier dtermination and remanding the cause, and with even greater precision and detail in the exhaustive opinion of Chief Judge Robert E. Taylor of the United States District Court for the Eastern District of Tennessee in his opinion following trial on the remand.[3] The case is again in this court on appeal from an order entered by the District Court following that remand. Because of the availability of full statements of the facts in those opinions they will be here presented in abbreviated form. This case and its companion cases were succinctly described by Judge Taylor in this manner:
 
 
 2
 'These cases are the last chapter in a spate of litigation between coal operators in Scott, Anderson and Campbell Counties, Tennessee, and United Mine Workers of America * * * resulting from labor disputes that arose in 1955 and continued intermittently through 1959.' (257 F.Supp. at 817.) The original plaintiffs (not parties to this appeal), hereinafter referred to as 'Trustees' (John L. Lewis, Henry G. Schmidt and Josephine Roche, Trustees of the United Mine Workers of America Welfare and Retirement Fund) brought this action against the cross-plaintiffs-appellants, hereinafter referred to as the 'plaintiffs-appellants' or as 'Phillips'; the individual plaintiffs-appellants are James M. Pennington, Raymond E. Phillips and Bruce Phillips,[4] and they were named individually and as trading as Phillips Brothers Coal Company, a Partnership. Sought in the action was the sum of $55,982.62 allegedly due as royalty payments under a trust provision in a wage agreement entered into between the United Mine Workers of America (hereinafter 'UMW' or the 'Union') and Phillips. The agreement referred to is the National Bituminous Coal Wage Agreement of 1950, as amended September 29, 1952, hereinafter the 'National Agreement.' This agreement was executed by Phillips and UMW October 1, 1953, and reexecuted with amendments September 8, 1955, and October 22, 1956. Responsive to the complaint, Phillips filed an answer and a cross-claim against UMW praying for actual damages in the amount of $100,000 and for punitive damages, alleging that Trustees, the UMW and certain large coal operators had conspired to restrain and monopolize interstate commerce in violation of Sections 1 and 2 of the Sherman Anti-Trust Act, as amended, 26 Stat. 209, 15 U.S.C. 1, 2 (1958 ed.).
 
 
 3
 In the answer it is alleged that Phillips entered into the National Agreement, the execution of which is not contested, by reason of duress in the form of a program of terrorism instigated by the UMW in the area of Phillips' mine. It is alleged that the agreement, and its amendments, were executed because otherwise Phillips would not have been permitted to operate their coal mine. It is the contention of the answer that for these reasons the contract is illegal and that no liability for royalties exists under it. However, it was held by this court that regardless of the factual contentions of the plaintiffs-appellants under these defenses, the Trustees were entitled to recover the royalties contracted for which were based on the tonnage mined during the period of time involved. 325 F.2d 804. Certiorari was denied (381 U.S. 949, 85 S.Ct. 1796, 14 L.Ed.2d 723 (1965)), judgment was entered for the Trustees, and no issue in this regard is presented under the present appeal.
 
 
 4
 In the cross-claim it is alleged that prior to the National Agreement questions concerning wages, the welfare fund and the UMW's efforts to control working hours had resulted in controversy, but that the National Agreement had resulted in relative peace. Overproduction of coal was alleged to be the critical problem of the industry and the elimination of the smaller operators and consequent placing of control of the market in the larger companies was stated to be the agreed solution. The cross-claim states that the UMW abandoned its efforts to control working hours, agreed not to oppose rapid mechanization of the mines, on the contrary to help finance such mechanization, and to impose the terms of the National Agreement on all operators. The UMW was allegedly to benefit from increased wages as mechanization increased productivity, but the smaller companies were to be required to pay the increased wages whether mechanized or not. Welfare fund payments were to be proportionately increased and other steps prohibiting the marketing, production and sale of nonunion coal were alleged to have been agreed to by the UMW and large companies. They obtained a minimum wage for employees of operators selling coal to the Tennessee Valley Authority under the provisions of the Walsh-Healey Act, as amended, 49 Stat. 2036, 41 U.S.C. 35 et seq. Four of the larger companies subsequently are claimed to have waged a destructive and collusive price-cutting campaign in the TVA coal market, in two of which the UMW is alleged to have held a sufficient interest to make control possible.
 
 
 5
 This Court affirmed the judgment against the UMW entered on the jury verdict holding that the UMW was not exempt from liability under the Sherman Act, found that trial judge's instructions to the jury adequate and held the evidence generally sufficient to support the verdit. 325 F.2d 804. Certiorari was granted (377 U.S. 929, 84 S.Ct. 1333, 12 L.Ed.2d 294 (1964)),[5] and as previously noted the Supreme Court reversed and remanded the cause. 381 U.S. 657, 85 S.Ct. 1585, 15 L.Ed.2d 626. That decision of the Supreme Court will herein be referred to as 'Pennington.'
 
 
 6
 The principal issues in this action find their genesis in Sections 1 and 2 of the Sherman Anti-Trust Act. Section 1 prohibits 'every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce * * *.' Only unreasonable or undue restraints fall within the proscription of this section, as determined by application of what the Supreme Court has referred to as 'the rule of reason.' E.g., Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under this standard, each restraint is evaluated in light of the particular facts of that case, considering the peculiarities of the industry, the conditions in the industry before and after the inception of the restraint, the nature of the restraint and its effect, the problem to which the restraint was directed, and the end or purpose sought by reason of the restraint. The test is whether 'the restraint imposed, is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.' Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Under the rule of reason some restraints such as price fixing and market allocation are conclusively presumed to be unreasonable and to constitute per se violations of the Act. See, e.g., United States v. E. I. DuPont DeNemours & Co., 351 U.S. 377, 387, 76 S.Ct. 944, 100 L.Ed. 1264 (1956).
 
 
 7
 Section 2 of the Sherman Act makes it illegal to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * *.' Of the three courses of conduct proscribed by this section, we are here concerned with only the third, that of combining or conspiring to monopolize trade. Unlike the substantive offense of monopolization, where it need be established that a company has monopoly power (power to fix prices and exclude competitors) coupled with a general or deliberate intent to exercise that power (United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed.2d 1575 (1946)) a specific intent to accomplish an unlawful result is necessary where monopoly power has not been obtained and the charge is an attempt or conspiracy to monopolize. See American Tobacco Co. v. United States, supra; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). In the conspiracy cases, proof of this specific intent will as a practical matter ofter merge with proof of the conspiracy itself.
 
 
 8
 Cases involving labor unions present special problems in connection with the antitrust laws. The dissent in Pennington reviews at length the difficulties had in harmonizing the two areas of law. One of the cases cited there was Apex Hosiery v. Leader, 310 U.S. 409, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), in which the Court held that the Sherman Act was aimed, not at restraints occasioned by union organizational strikes which interrupt interstate shipments of goods, but at restraints upon commercial competition in the marketing of goods. In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941) a union struck an employer who had given work to a competing union. This was held to be no violation of the Sherman Act since all union conduct specified in section 20 of the Clayton Act was, in light of the Norris-LaGuardia Act, immunized from the antitrust laws. 'So long as a union acts in its self-interest and does not combine with nonlabor groups, the licit and the illicit * * * are not to be distingushed by any judgment regarding the wisdom or unwisdom * * * of the end of which the particular union activities are the means.' 312 U.S. at 232, 61 S.Ct. at 466.
 
 
 9
 In Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the union was held liable under the Sherman Act. In that case, the union obtained closed shop agreements by strikes and boycotts under which electrical contractors were obligated to purchase equipment from none but local manufacturers; 'manufacturers obligated themselves to confine their New York City (the pertinent market) sales to contractors employing' union members. Such agreements
 
 
 10
 'expanded into industry-wide understandings, looking not merely to terms and conditions of employment but also to price and market control. Agencies were set up composed of representatives of all three groups to boycott recalcitrant local contractors and manufacturers and to bar from the area equipment manufactured outside its boundaries. The combination among the three groups, union, contractors, and manufacturers, became highly successful from the standpoint of all of them. * * * The three groups, in combination as 'co-partners', achieved 'a complete monopoly which they used to boycott the equipment manufactured by the plaintiffs. " 325 U.S. at 799-800, 65 S.Ct. at 1535. The Court concluded that the combination of businessmen violated the Sherman Act unless it was immunized by participation by the union. The issue framed was whether the union was liable under Sherman when, 'to further their own interests as wage earners, they aid and abet business men to do the precise things which that Act prohibits?' Id. at 801, 65 S.Ct. at 1536.
 
 
 11
 The Court noted that the means used by the union such as strikes were not violative of the federal antitrust laws under section 20 of the Clayton Act. Yet the union combined with the contractors and manufacturers, who were violating the Act. The Court stated:
 
 
 12
 'We think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services.' Id. at 808, 65 S.Ct. at 1539.
 
 
 13
 Absent the illegal combination of businessmen, the Court suggested that the union could have achieved the same results as the illegal monopoly by dealing (or coercing by means of economic sanctions such as strikes) each contractor and manufacturer on an individual basis:
 
 
 14
 'Employers and the union did here make bargaining agreements in which the employers agreed not to buy goods manufactured by companies which did not employ the members of (the union). We may assume that such an agreement standing alone would not have violated the Sherman Act. But it did not stand alone. It was but one element in a far larger program in which contractors and manufacturers united with one another to monopolize all the business in New York City. * * * So far as the union might have achieved this result acting alone, it would have been the natural consequence of labor union activities exempted by the Clayton Act. * * * But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions * * *. 'Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups.' Id. at 809, 810, 65 S.Ct. at 1539.
 
 
 15
 It has of course been established that the UMW dealt with a 'combination' of business competitors in the form of a multi-employer bargaining unit in the present case.
 
 
 16
 As indicated above, a combination to restrain trade by fixing prices, regardless of the reasonableness of such price, is illegal per se. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). 'Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.' United States v. Socony-Vacuum Oil Co. Inc., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). It is alleged in this case that two of the larger coal producers, West Kentucky Coal Company and the Nashville Coal Company, companies in which UMW had invested $25,000,000 of risk capital, submitted bids for the huge TVA coal account in a manner calculated to depress the price on the TVA coal market, and thereby drive small operators out of business. The trial court specifically rejected this contention and found the proof insufficient to establish 'that West Kentucky Coal Company or any other coal operator bid on TVA coal for the purpose of depressing the price of coal on the TVA coal market and thereby drive small operators, including plaintiffs, out of business * * * or that West Kentucky Coal Company or any other operator through arrangement, combination or otherwise fixed the price or attempted to fix the price of coal on the TVA market.' 257 F.Supp. at 863. The court further found plaintiffs' proof to be insufficient to show that the 'UMW, by arrangement, combination or otherwise, influenced or attempted to influence West Kentucky Coal Company or any other coal operator in bidding for coal on the TVA market.' Ibid. These findings are supported by evidence in the record and are not clearly erroneous.
 
 
 17
 While one company may legitimately decline to deal with another (United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)), group boycotts or concerted refusals by some companies to trade with others constitutes a per se violation of the Sherman Act. United States v. Columbia Steel Co., 334 U.S. 495, 522 (1948); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 708, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). When the instant case was previously before the Supreme Court, one of the allegations upon which six justices relied in rejecting UMW's contention that it was exempt from the Sherman Act was that the large companies together with the Union agreed not to lease coal lands to non-union operators, and agreed not to sell or buy coal from such companies. 381 U.S. at 660 and 674, 85 S.Ct. 1585. This allegation was undoubtedly based, in part at least, upon a land-lease provision contained in an amendment to the National Agreement and upon provisions of the Protective Wage Clause which was inserted in the National Agreement in 1958. However, plaintiffs do not on this appeal advance a claim of a concerted refusal to deal, and a review of the record in light of the District Court's finding concerning these clauses (257 F.Supp. at 862) demonstrates that no Sherman violation could be founded on those clauses under Hutcheson, supra, and Allen Bradley, supra. Plaintiffs do, however, rely on the provisions of the Protective Wage Clause of 1958 in support of their contention that the Union unlawfully conspired with the Bituminous Coal Operators Association (herein the 'BCOA') to restrain and monopolize trade in the coal industry.
 
 
 18
 Plaintiffs' principle contention is that the UMW, in combination with the BCOA, agreed to impose the wage and royalty scales set forth in the National Agreement upon all operators regardless of their ability to pay. One issue presented is whether the District Court properly held 'that the Pennington case teaches that it is necessary to find predatory intent to drive small coal operators out of business in order to hold the employer and Union for a violation of the Sherman Act.'
 
 
 19
 In Pennington the Supreme Court, in an opinion by Mr. Justice White and joined by Mr. Chief Justice Warren and Mr. Justice Brennan, stated:
 
 
 20
 'We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.' 381 U.S. at 665, 85 S.Ct. at 1591.
 
 
 21
 As reflected by the Court's language immediately following the above statement, it appears that Mr. Justice White considered such an agreement to be tantamount to an agreement to eliminate competition:
 
 
 22
 'One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry.' Id. at 665-666, 85 S.Ct. at 1591.
 
 
 23
 Justice White thus says in effect that if a union and some employers conspire to eliminate some or all of the employers' competition, this is a violation of the Sherman Act even if the mechanism is the imposition of a wage scale which the union is free unilaterally to impose. It was upon this premise (that the purpose of the bargaining agreement was to drive some employers out of business), that Mr. Justice Douglas, joined by Justices Black and Clark, concurred:
 
 
 24
 'On the new trial the jury should be instructed that if there were an industry-wide collective bargaining agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that if it was made for the purpose of forcing some employers out of business, the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws.' 381 U.S. at 672-673, 85 S.Ct. at 1595.
 
 
 25
 In view of the two opinions in which a majority of the justices joined, it is here determined that the District Court's holding was correct. That court's interpretation of Pennington is in accord with the principle announced in United States v. Hutcheson, supra (that a union must act in furtherance of its own self-interest in order to retain immunity from the antitrust laws), and reaffirmed in Allen Bradley Co. v. Local No. 3, supra. We thus understand Pennington to teach that:
 
 
 26
 1) a conspiracy between employers and labor formed with the intention of driving competitors out of business is a violation of the Sherman Act;
 
 
 27
 2) 'predatory intent' (as used by Mr. Justice White (381 U.S. at 668, 85 S.Ct. 1585) and by Judge Taylor) is merely shorthand, employed to describe this anti-competitive conspiracy; and
 
 
 28
 3) such an anti-competitive conspiracy must be established by 'clear proof.' See also United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 29
 While the jury by its verdict in the first trial of this case had found a conspiracy between the UMW and large mine operators to put smaller mine operators out of business by a preponderance of the evidence, Judge Taylor found such a conspiracy not to have been shown by 'clear proof' at the second trial. Judge Taylor properly concluded that a degree of proof less than the 'beyond a reasonable doubt' requirement in criminal cases but greater than the 'preponderance of the evidence' standard of civil actions is necessary. 257 F.Supp. at 829. The District Court's determination that judged by this standard evidence of sufficient probity had not been offered is supported by a review of the record and is not clearly erroneous. Rule 52 F.R.Civ.P.
 
 
 30
 Justice White, in his opinion joined by two other justices, also held that an agreement between employers and a union to impose a particular wage scale on other employers is a per se violation of the Sherman Act. It seems doubtful that this per se view is supported by a majority of the Supreme Court. We believe, however, that decision on this point is unnecessary since we agree with the District Court that the disputed Protective Wage Clause, properly construed, did not require the Union to impose the wages therein contained on the nonsignatory employers. The Protective Wage Clause is capable of two reasonable constructions, and the District Court properly held that in such circumstances the construction should be adopted that does not result in a violation of law. Great Northern Railway Co. v. Delmar Co., 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349 (1931); Perry Coal Co. v. N.L.R.B., 284 F.2d 910, 914 (7th Cir. 1960). We add the observation, however, that even without the operation of this principle of law we would incline to the conclusion that the agreement did not constitute a violation of the Sherman Act, the record containing insufficient evidence from which a conspiracy or other violation could be found to have been clearly shown.
 
 
 31
 In conclusion, we find that the District Court properly dismissed the complaint in this case on the ground that plaintiffs failed to prove 'that the defendant engaged in a combination or conspiracy so as to unreasonably restrain trade or to monopolize commerce among the several states as alleged * * *.' Accordingly, the judgment of the District Court in case No. 17,445 is affirmed.
 
 No. 17452
 No. 17453
 
 32
 After the remand of Pennington to the District Court for retrial, these two cases (and five others not herein considered) were consolidated with it for trial. Following trial, they were considered and disposed of in the lengthy opinion of Judge Taylor hereinabove referred to (257 F.Supp. 815), and although separately appealed oral arguments in all three cases were heard in this court at the same sitting. The causes of action involved on appeal were alleged in cross-claims in actions instituted by the UMW, but its claims were resolved by summary judgments and under the provisions of the pretrial orders entered in each case the cross-complaints were considered as complaints. The cross-plaintiffs accordingly appear here as plaintiffs-appellees, and the UMW, which perfected these two appeals, as defendant-appellant. The plaintiff-appellee in case No. 17,452 is the Dean Coal Company, and in No. 17,453 W. R. Parton, d/b/a W. R. Parton Coal Company, hereinafter referred to as 'Dean' and 'Parton' respectively.
 
 
 33
 Although included in the cases referred to by Judge Taylor as constituting 'the last chapter in a spate of litigation between coal operators in (certain Tennessee counties) and United Mine Workers of America,' and while there is some overlapping of the questions involved, the issues in these cases are considerably narrower than in Pennington. We mentioned earlier that the facts have been developed fully in previously reported opinions, and the facts in the Dean and Parton cases appear in detail in Judge Taylor's opinion (see particularly 257 F.Supp. 865-868). In their final forms the complaints asserted claims against the UMW for alleged Sherman Act violations and for alleged violations of the law of Tennessee. Final judgment was entered in the District Court dismissing the cause of action alleged against the UMW under the Sherman Act with prejudice, and for plaintiffs-appellees under the alleged violations of Tennessee law. Judgment in favor of Dean against the UMW was entered for compensatory damages in the amount of $101,787.41, punitive damages in the amount of $50,000, for a total of $151,787.41, with interest plus costs. Judgment was entered in favor of Parton for a violation of the Tennessee law in the amount of $110,000 as compensatory damages, $50,000 as punitive damages, for a total of $160,000, with interest plus costs. It is from those judgments that the UMW has appealed to this court.
 
 
 34
 The first question is whether the District Court properly concluded that it had pendent jurisdiction of the common law action in these cases brought originally as actions arising under the Sherman Act. Even though a diversity of citizenship between the parties does not exist, a federal court has pendent jurisdiction to resolve a state law claim asserted under certain circumstances with a federal claim. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Such pendent jurisdiction was also found to exist in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Therein the Supreme Court stated two of the requirements for the exercise of pendent jurisdiction to be (1) that the federal claim have 'substance' so as to confer jurisdiction of the subject matter on the court in which the action is commenced and (2) that the 'state and federal claims must derive from a common nucleus of operative fact.' The UMW concedes, in spite of the District Court's ultimate dismissal of Dean's and Parton's federal claims, that those claims were 'substantial' within the meaning of Gibbs. It strenuously challenges the existence of a 'common nucleus of operative facts,' arguing that the Sherman Act claim 'embraces so many allegations irrelevant in time and content to the state claim, that to find there is a 'common nucleus of operative fact' is to destroy the practical significance of this requirement.' However, it cannot be denied that there is at the very least a significant overlapping of the facts alleged and proved under the Sherman Act and state law claims, and it cannot be said that the District Court's resolution of this issue in favor of jurisdiction was a clearly erroneous abuse of discretion. The next question presented concerns the degree of proof required in support of Dean's and Parton's allegations in order to entitle them to recover, and whether or not the District Court applied that standard. We have earlier stated our agreement with Judge Taylor's conclusion that under Section 6 of the Norris-LaGuardia Act (29 U.S.C. 106) as interpreted by Gibbs, (UMW v. Gibbs, supra, 383 U.S. 715, 86 S.Ct. 1130) 'clear proof' is required to hold a union liable for damages in which it actually participated or authorized or ratified. In arguing that the District Court used the Section 6 and Gibbs requirement as to quantum of proof the plaintiffs-appellees quote statements made from the bench during the trial which indicate an awareness of that standard. However, although specific reference to that requirement is frequent and cogent in Judge Taylor's discussion of the Pennington case, he makes no reference to it in connection with the Dean and Parton cases. On the contrary, from the discussions therein of union responsibility 'for acts performed and instigated by (its) agents in the course of their employment,' and in connection with the establishment of the agency relationship, it seems possible that only the common law standard of a preponderance of the evidence was contemplated. We are of the opinion that in this lengthy record of a protracted trial, including testimony of interference with hauling operations, verbal threats of work stoppages, the wanton discharge of firearms, the placing of a dynamite charge (albeit unexploded), distribution of gasoline in areas of frequent destruction by arson, all in a locality tense with fear and anger, evidence exists from which conspiracy to commit illegal violence could be found, and that evidence was presented upon which damages under Tennessee law could be predicated. As already indicated, however, we cannot on that record and from the District Court's opinion determine that theproper requirement as to the degree of proof was applied as to the elements essential to liability and recovery of damages in the amounts assessed. Accordingly, it is concluded that a remand for the purpose of reviewing the evidence in the light of the proper standard of proof is required.
 
 
 35
 If liability is established upon remand, either by reexamination of the evidence in light of the proper standard or by confirmation that such standard had in fact been applied in the first instance, an award of damages attributable to the UMW's violence would of course be proper. The Union claims, however, that the District Court improperly computed the amount of compensatory damages awarded Dean and Parton. While the findings as to the amount of compensatory damages appear to be clearly erroneous, we here hold only that the District Court's general and conclusory findings in this regard must be supported by additional specific subsidiary findings.
 
 
 36
 It is initially observed that the Court in United Mine Workers v. Gibbs, 383 U.S. 715, 729, 86 S.Ct. 1130, 1140 (1966) held that the 'permissible scope of state remedies in this area (of violence in labor disputes) is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity.' See also Teamsters Local 20 v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). And in International Union, U.A., A. & A.I.W. v. American Metal Products, Co., Tennessee, 408 S.W.2d 682, 707 (1964), the court held that 'plaintiff is not entitled to recover losses resulting from the exercise by the defendant Unions of their lawful right to strike.' In the case at bar, it cannot be said that the District Court, which found inter alia that the losses sustained by Dean and Parton were 'caused by violent conduct' instigated and carried out by UMW members and officials, disregarded the above preemption principles and permitted recovery for losses sustained by the Companies due to lawful union activity.
 
 
 37
 The Union contends that the compensatory damages awarded the Companies are speculative. It is recognized that the computation of damages in a case such as this is a difficult task, where many factors must be taken into account, and where absolute, objectively demonstrable accuracy can be neither expected nor required. Because of the complexity of the subject matter here, general findings provide an inadequate basis for review by this Court.
 
 
 38
 The Dean Coal Company's income tax returns showed the following record of profits and losses:
 
 
 39
 1955 .. $32,407.22
1956 ... 31,710.20
1957 ... 17,226.84
1958 .... 2,469.32 Loss
1959 ... 37,531.47 Loss
1960 ... 13,249.94 Loss
1961 .... 1,233.39
1962 ... 13,441.38
 
 
 40
 The District Court found that Dean 'suffered an operating loss in 1959 on account of the wrongful and unlawful acts of the defendant of $37,537.47 and an operating loss in 1960 of $13,249.94, or a total operating loss of $50,787.41.' This latter figure, together with the Company's loss of profits, discussed below, formed the basis for the compensatory damages awarded Dean by the District Court. However, the violence which allegedly interrupted the Company's operations did not commence until March 16, 1959, and absent some further explanation, the Company's loss for the entire year 1959 cannot properly be attributed to UMW activities.
 
 
 41
 With respect to the issue of Dean's loss of profits the District Court set forth its general finding that: 'There is proof supporting a total loss of profits for 1958-60 of $17,000.00 a year, or a total of $51,000.00.' No claim is made for damages caused by the Union's violence during the year 1958, and the District Court's inclusion of that year was very likely a typographical or inadvertent error, as claimed by Dean. If, however, the intended period was 1959-61, the court would appear to have failed to consider the 1961 profit of $1,233.39 shown on the Company's tax return, and to have deducted that amount from the total.
 
 
 42
 Finding support for the conclusion that Dean Coal is entitled to a judgment of about $50,000 in lost profits (in addition to the losses it actually sustained) for a three year period after the Union interference began in March 1959, is more difficult, particularly in light of the fact that the Company's income dropped sharply from a profit of approximately $31,000 in 1956, to a loss of $2,400 in 1958. The trial court noted that the owner of Dean Coal Company attributed the 1958 loss to a heart attack he suffered in October of that year, and to low sales prices and unusually high equipment repair costs. The owner's heart attack was not shown to have had any significant economic impact upon the Company, while the explanation of low sales prices is in harmony with the District Court's previous finding that 'in 1958 the bituminous coal industry felt a recession and decreasing demand for coal so that the price of coal in the markets was to some degree affected.' There was also evidence that labor costs increased during the general period under consideration. Indeed, the substance of one of the coal producers' claims in the antitrust phase of these cases was that the Union participated in a deliberate drive to suppress the price of coal on the TVA spot market, and in attempts to obtain from the Secretary of Labor and under the Walsh-Healey Act minimum wage rates which small operators could not pay. We believe the findings of the District Court should reflect what impact, if any, these factors had in the determination that Dean had the potential for profitable production during 1959 and thereafter. The decision on this complex issue of damages provides an insufficient basis for review in that there are no 'subsidiary findings to support the ultimate conclusions of the court.' Deal v. Cincinnati Board of Education, 369 F.2d 55, 64 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); see Tappan Co. v. General Motors Corp., 380 F.2d 888 (6th Cir. 1967).
 
 
 43
 The Parton Coal Company, which also recovered damages from the UMW for tortious interference with its business, showed a pattern of declining income similar to that of Dean. Parton's income tax records disclose the following profits and losses:
 
 
 44
 1954 .. $19,865.90
1955 ... 12,088.14
1956 ... 25,409.03
1957 .... 1,633.41
1958 .... 9,414.22 Loss
 
 
 45
 The District Court found generally that Parton 'was making a profit, or capable of making a profit of at least $15,000.00 a year over a period of several years.' Perhaps by coincidence, the amount of $15,000 per year roughly approximates Parton's average yearly earnings for 1954 through 1957, excluding the 1958 loss which Parton attributed to the building of more haul roads and other road work. As in the Dean case, the District Court's general finding here should be supported by subsidiary findings actually assessing Parton's economic situation during the pertinent period of time.
 
 
 46
 We do not find, as claimed by the UMW, that the District Court erred as a matter of law in allowing punitive damages in these cases.
 
 
 47
 The remaining issue in the Dean and Parton cases concerning the taxation of costs will be treated below.
 
 Nos. 17446 through 17451
 
 48
 The Pennington, Dean and Parton cases, as well as the five other cases numbered 17,447 through 17,451 now on appeal, were consolidated for trial. As has been stated, the District Court found for the UMW on the antitrust claims bottomed on the Sherman Act, but found for Dean and Parton on their claims under the state or common law. Although the court acknowledged that 'the interest of the attorneys in the antitrust phase of the lawsuit overshadowed the alternative claims based on Tennessee law,' the costs of the consolidated cases were taxed against the UMW. The Union appeals this determination in all eight cases noted above. (The Union's appeal from the taxation of costs in Pennington, No. 17,446, is not to be confused with the Company's appeal in that case from the court's decision on the merits, No. 17,445.)
 
 
 49
 Two questions are presented in connection with the manner in which costs were taxed in these cases: 1) Did the District Court have the power to exercise its discretion to tax costs against the Union, and 2) if so, did the court abuse its discretion.
 
 
 50
 Rule 54(d), F.R.Civ.P., provides in pertinent part:
 
 
 51
 'Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs * * *.'
 
 
 52
 Section 4 of the Clayton Act (15 U.S.C. 15) provides in pertinent part:
 
 
 53
 'Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.'
 
 
 54
 It is the UMW's position that an 'express provision (for costs)', within the meaning of Rule 54(d), is found in Section 4 of the Clayton Act, thereby precluding the exercise of discretion the District Court would ordinarily have in awarding costs under the 'unless' clause of the Rule. See National Transformer Corp. v. France Mfg. Co., 215 F.2d 343 (6th Cir. 1954); Solo Cup Co. v. Paper Mach. Corp., 359 F.2d 754 (7th Cir. 1966). This contention cannot be accepted.
 
 
 55
 Section 4 of the Clayton Act provides in effect that a prevailing plaintiff in an antitrust action shall recover 'the cost of suit, including a reasonable attorney's fee.' To this extent, that section makes 'express provision' for costs, and a district court would be powerless under Rule 54(d) to deny such plaintiff his costs in the exercise of discretion. It does not follow, however, that an unsuccessful plaintiff to an antitrust case is conclusively deprived of a favorable disposition of costs by the court where the circumstances warrant. Neither reason nor authority requires such a result. Simply stated, Section 4 does not make 'express provision' for costs in cases where a plaintiff fails to prove his antitrust claims, and the District Court therefore had discretion in the taxation of costs in these cases.
 
 
 56
 The remaining question is whether the District Court abused its discretion in taxing costs against the UMW, which prevailed on the Sherman Act claims. We are constrained to answer in the affirmative.
 
 
 57
 This Court has held that 'The prevailing party is prima facie entitled to costs and it is incumbent upon the unsuccessful party to show circumstances sufficient to overcome the presumption.' Lichter Foundation, Inc. v. Welch, 269 F.2d 142, 146 (6th Cir. 1959). Such circumstances might be where 'the amount of taxable costs actually expended were unnecessary or unreasonably large under the circumstances, where the denial of costs was in the nature of a penalty for injecting unmeritorious issues into the case or unnecessarily prolonging the trial * * * or where the judgment recovered was insignificant in comparison to the amount actually sought and actually amounted to a victory for the defendant.' Id. at 146. See also Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1 (7th Cir. 1949), cert. denied,338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950). The Lichter decision further negates the conclusion that the ability of a party litigant to pay costs is a valid criterion in assessing them.
 
 
 58
 In denying the UMW's motion to award costs in its favor and against 'the unsuccessful coal companies to the extent that the costs of the consolidated actions pertain to the antitrust phase of the sonsolidated actions,' the District Court stated:
 
 
 59
 'With respect to the taxation of court costs, the Court is further of the opinion from all the circumstances shown in the record that equity required that the costs of the consolidated cases be paid by the UMW.'
 
 
 60
 While we can only surmise what 'equities' the lower court had in mind in denying the Union's motion, it very well may be that the trial judge was unsympathetic toward the established policy of the UMW, of attempting to improve the working and living standards of its members throughout the industry without any apparent regard for the continued existence of marginal operators. This clearly would be an impermissible ground upon which to tax the Union all the costs in these cases. In any event, we find no reasonable ground in support of the District Court's action and accordingly set aside the award of costs against the UMW.
 
 
 61
 Although the Dean and Parton coal companies prevailed on only one of two grounds advanced, they are to be deemed 'prevailing parties' (See Hines v. Perez, 242 F.2d 459 (9th Cir. 1957); Westchester Fire Ins. Co. v. Hanley, 284 F.2d 409 (6th Cir. 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 860 (1961)), and should the decision in their favor be reaffirmed upon remand, the portion of the costs attributable to those cases may properly be assessed against the UMW.
 
 
 62
 The judgments appealed from in cases Nos. 17446 through 17453, inclusive are reversed and the causes remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 325 F.2d 804 (6 Cir., 1963)
 
 
 [2]
 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)
 
 
 [3]
 257 F.Supp. 815 (1966)
 
 
 [4]
 The administratrix of his estate was substituted as a party defendant after the death of Bruce Phillips
 
 
 [5]
 Petitioner in this proceeding was the UMW, and it is not to be confused with the proceeding hereinabove mentioned in which certiorari was denied (381 U.S. 949, 85 S.Ct. 1796, 14 L.Ed.2d 723), wherein plaintiffs-appellants were the petitioners, and which concerned only the judgment in favor of Trustees on the royalties issue