JAMES R. SNYDER COMPANY, INC., Ebeling & Hicks, Inc., Clarence Gleeson, Inc., and Leo J. Vendervennet & Sons, Inc., Plaintiffs-Appellants, Cross-Appellees,

v.

ASSOCIATED GENERAL CONTRACTORS OF AMERICA, DETROIT CHAPTER, INC., Barton-Malow Co., Darin & Armstrong, Inc., R. E. Dailey & Co., Thomas E. Dailey, A. Z. Shmina & Sons Co., Detroit Building Employers Labor Council, Stanley E. Veighey, John W. Lanzetta, Frank D'Agostino and John McCoy, Defendants-Appellees, Cross-Appellants.

Nos. 80–1030, 80–1031.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1981.

Decided April 29, 1982.

Donald E. Mather, Mount Clemens, Mich., Jerry S. Cohen, Washington, D.C., Harold E. Kohn, P. A., Philadelphia, Pa., for plaintiffs-appellants, cross-appellees.

William M. Saxton, Butzel, Lang, Gust, Klein & Van Zile, Detroit, Mich., Delmer C. Gowing, III, Bloomfield Hills, Mich., for defendants-appellees, cross-appellants.

Before EDWARDS, Chief Judge, and ENGEL and MARTIN, Circuit Judges.

ENGEL, Circuit Judge.

Among numerous issues raised in these cross-appeals is a significant question concerning the application of the Federal Rules of Evidence, as they affect admission of coconspirators' out-of-court statements, and the extent to which our circuit's construction of these rules in criminal prosecutions applies also to civil litigation. Equally important, these appeals require us to consider the difficult issue of the sufficiency of the evidence of an alleged illegal antitrust conspiracy, where that evidence consisted almost entirely of actions which are permitted under the nation's labor laws. Upon consideration of these and other issues, we affirm a judgment entered by the district court following direction of a jury verdict in favor of the defendants.

Plaintiffs are independent masonry contractors in Detroit, Michigan. They are also members of the Detroit Mason and Construction Association (DMCA). DMCA members employ bricklayers and laborers in the metropolitan area of Detroit. Since 1958, the DMCA has negotiated labor agreements on behalf of its members and other masonry contractors with unions representing both the bricklayers and laborers.

The defendants, the Associated General Contractors of America (AGC), Detroit Chapter, Inc., the Detroit Building Employers Labor Council (also known as the Construction Employers Council) (CEC), and various members and officers of those organizations, entered into a multi-trade/multi-employer labor agreement[1]

1. In the multi-trade/multi-employer agreement, unions from 24 different trades and employers from 18 contractor's associations agreed to a monetary package on February 17, 1970. The agreement provided for a $0.90 increase effective on the expiration date of the current agreement; a $0.15 increase effective on October 1, 1970; and a $0.95 increase effective on June 1, 1971—for an overall $2.00 increase over two years. Also, the unions and employers agreed that value of cost-bearing conditions, later agreed to, would be subtracted from the monetary package and that no strike or lockouts would occur over the conditions. The agreement was not binding on most of the unions until ratified by their memberships.

which had the effect of establishing wage rates and fringe benefits for construction workers in the metropolitan Detroit area. In their complaint, plaintiffs alleged that defendants had conspired with the unions which had participated in the multi-trade/multi-employer agreement to impose the terms of that agreement upon smaller non-signatory employers in an attempt to drive them out of business. Plaintiffs claimed that this conduct violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Plaintiffs sought treble damages and injunctive relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (1976).

Trial commenced before a jury, but at the conclusion of the plaintiffs' proof the district court entered a directed verdict in favor of the defendants. The district court held that the plaintiffs had failed as a matter of law to establish a *prima facie* case for relief under the Sherman Act. The plaintiffs appeal, claiming that the trial judge improperly excluded from evidence certain out-of-court statements by alleged coconspirators which tended to prove an illegal agreement existed. They also claim that the evidence was sufficient to submit the issues to the jury regardless of whether the out-of-court statements were admitted into evidence. The defendants cross-appeal from the trial court's denial of their motion to dismiss for lack of jurisdiction under the Sherman Act.

### I.

Because it raises the issue of subject matter jurisdiction, we first address the cross-appeal. Defendants contend that plaintiffs failed to prove that the alleged agreement restrained "trade or commerce among the several states...." 15 U.S.C. § 1. Defendants properly assert that without proof of such interstate effects Sherman Act jurisdiction would be lacking.

At the jurisdictional hearing held prior to trial by the district court, plaintiffs presented evidence in an attempt to show that

their activity as masonry contractors, while not directly in interstate commerce, substantially affected interstate commerce. Because defendants' alleged antitrust violations altered plaintiffs' interstate activities, plaintiffs argue that defendants' illegal acts served as a basis for Sherman Act jurisdiction. At the close of the proofs submitted during the jurisdictional hearing, the district court found that plaintiffs engaged in no masonry work outside the State of Michigan, or at least they would not be bound by the terms of any labor contract negotiated in Michigan if they were to do so.[2] It therefore concluded that plaintiffs' businesses were not directly in interstate commerce for the purposes of this litigation.

Because Sherman Act jurisdiction exists not only when activities are *in* interstate commerce but also when activities have an *effect on* interstate commerce, see *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980), the district court continued its factual determination and found that plaintiffs acquired between fifteen and twenty-five percent of their prime commodity, bricks and masonry products, from outside Michigan. It further found that as a result of the monetary settlement contained in the multi-trade/multi-employer labor agreement, plaintiffs later had to accept labor contracts with the bricklayers and laborers which provided wages and fringe benefits in excess of what they otherwise would have had to pay; that the plaintiffs lost business due to the need to increase their bid prices on construction projects to cover the higher labor costs they incurred as a result of the new labor contract; and that because plaintiffs were less successful in securing construction projects, they purchased fewer bricks and other masonry products from out of state.

The district court also found, however, that the total demand for masonry work in the Detroit area was not affected by the wage scale paid to bricklayers and laborers.

---

**2.** The uncontroverted evidence showed that had the plaintiffs engaged in masonry construction out-of-state, in Toledo, Ohio, for example, plaintiffs would be required to pay the wage rates and fringe benefits which prevailed in the Toledo area.

Therefore, any work lost by plaintiffs was gained by other masonry contractors. Because plaintiffs' competitors also purchased bricks and masonry products from out of state, the same amount of those materials continued to flow into the State of Michigan from interstate commerce, and any work lost by plaintiffs was gained by others.

The defendants relied upon a number of cases in which it has been held that the mere substitution of purchasers of goods from interstate commerce confers no jurisdiction under the Sherman Act. *See Page v. Work*, 290 F.2d 323, 332 (9th Cir. 1961), *cert. denied*, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961); *Dominion Parking Corp. v. B & O Railroad*, 450 F.Supp. 441, 446 (E.D.Va.1978). The rationale of those decisions was that interstate commerce was not substantially affected since the same amount of supplies still flowed into the state.

The district court below, however, relied upon *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir. 1972), in finding that the plaintiffs had established jurisdiction under the Sherman Act. In *Lehrman*, a single Gulf service station in Texas sued Gulf for treble damages under the Sherman Act, alleging that Gulf's complicated system of setting wholesale prices for its gasoline was used as a mechanism for fixing the retail prices at which dealers resold Gulf gasoline. Because the vast majority, if not one hundred percent, of the gasoline sold by Gulf to Lehrman was produced in the State of Texas, Gulf asserted that Lehrman had not shown jurisdiction under the Sherman Act. The Fifth Circuit held that since the Lehrman service station also sold tires, batteries and accessories which were manufactured outside of Texas, and since there was a reduction in Gulf's interstate purchase of those items even if the absolute volume of such purchases remained constant in Texas after Lehrman went out of business, a sufficient nexus with interstate commerce existed.

We agree with the district court that the Sherman Act has sufficient reach to touch the activities here. That reach has been held to extend as far as Congress' constitutional power to regulate interstate commerce. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 201, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). Whatever questions may have existed concerning Sherman Act jurisdiction where there has been a substitution of purchasers of goods from interstate commerce, they no longer exist after the more recent decisions of the Supreme Court on this subject.

In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the plaintiff alleged that the defendants were engaged in an unlawful conspiracy to restrain trade in the furnishing of medical and surgical hospital services and that they were attempting to monopolize the hospital business in Raleigh, North Carolina. The district court dismissed petitioner's amended complaint on the pleadings, finding no Sherman Act jurisdiction. The Fifth Circuit, sitting *en banc*, affirmed. The Supreme Court reversed, holding that four of petitioner's allegations supplied the requisite jurisdictional facts. First, petitioner purchased supplies from out-of-state sources. Second, petitioner received revenues from out-of-state insurance firms. Third, petitioner remitted management fees to its out-of-state parent corporation. Fourth, petitioner would borrow from out-of-state lenders to finance some of its planned expansion. The Court found it irrelevant that no out-of-state supplier, insurer, or lender would "go under," or that no market price would be affected.

Later, in *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the plaintiff's complaint alleged that real estate brokers in the greater New Orleans area had agreed to a fixed rate of brokerage commissions on sales of residential property. This, the plaintiff alleged, was a price-fixing conspiracy in violation of section 1 of the Sherman Act. The district court dismissed the complaint for failure to establish the interstate commerce component of Sherman Act jurisdiction. The Fifth Circuit affirmed. Again, the Supreme Court reversed. The Supreme Court held that the plaintiff need only allege an interrelationship between the

intrastate activity which was the target of the unlawful conduct and a specified aspect of interstate commerce. If those allegations were controverted, the plaintiff must then prove that the defendant's conduct had, as a matter of practical economics, a not insubstantial effect on the interrelated activity which was demonstrably in interstate commerce. In *McLain*, the interrelated activity was alleged to have been the involvement of out-of-state suppliers, insurers, lenders and the out-of-state parent corporation. There was no suggestion in *McLain* that it was necessary to show that the aggregate amount of supplies, insurance or financing from interstate sources would have been diminished by the alleged unlawful activity.

 The facts here are parallel to those alleged in *McLain*. Plaintiffs alleged that there had been a conspiracy to require conformance with a fixed rate of labor. A substantial amount of products which were involved in plaintiffs' businesses was purchased from out of state. Plaintiffs' purchases of those products decreased as a result of the defendants' conduct. Therefore, the targeted activity (labor) was shown to have been interrelated with a specified aspect of interstate commerce (purchase of out-of-state products), and defendants' conduct was shown to have had a not insubstantial effect on plaintiffs' purchases of those products from interstate commerce. It was not necessary that plaintiffs further show that their out-of-state suppliers would "go under," or that the market price for such goods in interstate commerce would be affected. Nor was it necessary to show a decrease in the inter-state flow of those products into the State of Michigan.[3]

## II.

In support of their contention that defendants entered into an agreement with the unions to set a wage scale for the entire industry, plaintiffs attempted to put into evidence two out-of-court statements made to plaintiffs by union negotiators. The first statement was made by Carlo Martino, the chairman of the bricklayers' union executive committee. James R. Snyder testified that during the bricklayers' labor contract negotiations with the DMCA, Martino told plaintiffs Vandervennet and Snyder that:

> they really like our offer that we made but there was no way possible that they could change from the agreement they made with the multi-bargaining group, the contract they signed, that they were stuck with that.

Trial Transcript at 253. The second statement was made by bargaining agents for Laborers' Locals 334 and 1076, to the effect that they had "made an agreement with A.G.C. and would not go back on it." Trial Transcript at 264. Defendants made timely objections to the admission of these statements on the ground that they were hearsay, and plaintiffs responded that the statements were admissible under Federal Rule of Evidence 801(d)(2)(E),[4] as statements of coconspirators made in the course of and in furtherance of a conspiracy. Although these statements were conditionally admitted, the trial court eventually refused to consider them as being properly in evidence because the plaintiffs had not proven the

---

3. We are aware that a conflict exists between the circuits regarding *McLain*. The Ninth Circuit has held that Sherman Act jurisdiction exists when *any* business activity of a defendant affects interstate commerce. *Western Waste Service v. Universal Waste Control*, 616 F.2d 1094 (9th Cir. 1980). Under a more conservative view of the reach of the Sherman Act, the Tenth Circuit has taken the position that a defendant's *illegal* activities must affect interstate commerce for jurisdiction to be present. In the instant case, because the evidence supports a finding that defendants' alleged illegal actions affected interstate commerce, we need not decide whether Sherman Act jurisdiction could be founded solely on proof that defendants' general business activity affects interstate commerce.

4. Fed.R.Evid. 801(d)(2)(E) declares that statements of co-conspirators in the course of and furtherance of a conspiracy are not hearsay:

> (d) Statements which are not hearsay. A statement is not hearsay if—
> (2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

existence of a conspiracy by a preponderance of the evidence, as required under *United States v. Enright,* 579 F.2d 980 (6th Cir. 1978).

In *Enright,* the defendant was charged with criminal conspiracy. There was "extensive evidence" that an illegal conspiracy existed, but the prosecution offered out-of-court statements by alleged coconspirators to prove Enright's longstanding role in it. The issue was what standard of proof of conspiracy and of the defendant's connection to it would permit such statements to be admitted into evidence under Federal Rule of Evidence 801(d)(2)(E). The court held that the trial judge must be convinced by a preponderance of the evidence that a conspiracy existed and that the defendant participated in it before such statements were admissible.

Plaintiffs contend that since *Enright* was a criminal conspiracy case, the district court erred in applying the preponderance of the evidence standard to this civil case. Plaintiffs argue that one consideration in *Enright* which led to the adoption of the preponderance of the evidence standard was the desire to prevent the trial judge from usurping the jury's ultimate fact-finding function while ruling on the admissibility of evidence. Following logically from this, plaintiffs assert, the less stringent *prima facie* test should be employed by the trial judge in ruling on the admissibility of coconspirators' statements in civil conspiracy cases because the jury uses the preponderance of the evidence standard in fulfilling its ultimate fact-finding function.

Before adoption of the Federal Rules of Evidence, case law in this circuit held that out-of-court statements by alleged coconspirators were admissible in civil conspiracy cases upon a *prima facie* showing by independent evidence that a conspiracy existed and that the defendant was connected with it. *South-East Coal Co. v. Consolidation Coal Co.,* 434 F.2d 767, 779 (6th Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971). The preliminary question of the admissibility of this evidence was a matter for the judge, not the jury, to decide. *Id.* at 788. The adoption of the Federal Rules, however, has brought about significant changes in this area. First, as this court held in *United States v. Enright, supra,* the *prima facie* test is too lenient a standard to be employed under the Rules. This holding primarily resulted from the court's resolution of the question whether Rule 104(a),[5] or Rule 104(b),[6] applies to the admissibility of coconspirator's out-of-court statements. Rule 104(a) provides that preliminary questions of admissibility shall be determined by the trial court, while Rule 104(b) deals with preliminary questions of admissibility when the relevancy of the evidence depends upon the fulfillment of a condition of fact. Finding the question "to be more one of basic reliability and fairness of admitting the evidence rather than a relevancy question . . . ," the court concluded that "a fair reading of subsections (a) and (b) favors the construction that 104(a) should be applicable to the question of the admissibility of a co-conspirator's statements." 579 F.2d 984.

Because the court in *Enright* viewed Rule 104(b) "as a classic restatement of the *prima facie* test," 579 F.2d 984, it was led to the conclusion that:

the framers of 104(a), whatever else they may have intended, probably did not intend that the trial judge employ a *prima facie* test in resolving issues arising under that subsection. A determination under 104(a) is more demanding than a *prima*

---

**5.** Fed.R.Evid. 104(a) provides:

Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

**6.** Fed.R.Evid. 104(b) provides:

Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

*facie* test and calls for the exercise of judicial fact-finding responsibilities by the trial judge, responsibilities which require him to evaluate both credibility and the weight of the evidence.

579 F.2d 985 (footnote omitted). Recognizing that the fact-finding responsibilities of the judge and jury are distinct, the court adopted the preponderance of the evidence, rather than the reasonable doubt standard.

Also, since the decision in *South-East Coal Company*, this circuit has done away with the requirement that the conspiracy's existence and the defendant's participation therein be shown only by independent evidence. The out-of-court statements themselves now may be used to convince the trial judge of the conspiracy's existence and the defendant's participation in it. *United States v. Kendricks*, 623 F.2d 1165, 1168 n.5 (6th Cir. 1980); *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979). *Vinson*, as a practical matter, makes the preponderance standard easier to meet when presenting evidence to the trial judge on preliminary matters.

■ These post-Rules decisions lead us to the conclusion that the preponderance of the evidence standard should be used to determine the admissibility of out-of-court statements by alleged coconspirators in civil as well as criminal cases. *Enright* was based upon this court's construction of the Federal Rules of Evidence rather than upon notions of criminal law or procedure. Ex-

cept as constitutional considerations or statutes otherwise require, the same rules apply to civil and criminal cases. *See* Fed.R.Evid. 1101(b).[7] Use of the preponderance standard in civil conspiracy cases provides a uniform standard for determining admissibility of coconspirators' declarations in both civil and criminal contexts. *See* Sessions & Hall, *The Coconspirator's Statement: Evaluating Preliminary Questions of Admissibility Under Rule 801(d)(2)(E)*, 11 St. Mary's L.J. 83, 112 (1979); Comment, *The Impact of Federal Rule of Evidence 104 on the Coconspirator Exception to the Hearsay Rule*, 28 Emory L.J. 1115, 1133 (1979).

It is argued that a preponderance of the evidence test usurps the function of the jury to determine whether a conspiracy exists. This has surface appeal until it is remembered that what is involved here is a ruling on the admission or exclusion of particular evidence, and on this question only. As with all such judicial decisions on admissibility, the effect upon the outcome may be profound, but this comes from the ruling itself and not from the manner in which the law requires the trial judge to make it.[8]

■ Thus we agree with the district judge that the statements of the alleged coconspirators would be admissible to prove the existence of the illegal conspiracy only if, as a preliminary matter, the district judge found a conspiracy by a preponderance of the evidence.

---

7. Fed.R.Evid. 1101(b) provides:

(b) Proceedings generally. These rules apply generally to civil actions and proceedings including admiralty and maritime cases, to criminal cases and proceedings, to contempt proceedings except those in which the court may act summarily, and to proceedings and cases under the Bankruptcy Act.

It could be argued that the burden of proof for admissibility in a civil case should be less than that in a criminal case, because the civil defendant is not exposed to the risk of loss of liberty and, hence, has a lesser need for protection from incompetent evidence. This argument, however, misunderstands the basis for the *Enright* decision. In *Enright*, we were first guided by an interpretation of Rules 104(a) and 104(b) in reaching the conclusion that the Rules had eliminated the *prima facie* standard for preliminary questions of competency. We only

then determined that use of the preponderance standard in making these evidentiary decisions would satisfy constitutional concerns which might arise in criminal cases. *U. S. v. Enright, supra*, 579 F.2d at 984–85. *Enright* thus illustrates that the issue is primarily one of interpreting the Federal Rules of Evidence, rather than considering the burdens of proof required for the substantive issues in the case.

8. By applying *Enright* to civil litigation, we do not diminish the value of the coconspirator's statements in proving the existence of a conspiracy since, as *Vinson* makes clear, the coconspirator's statements may be considered by the trial judge in making the evidentiary determination. Moreover, if admitted, those statements may make the other evidence on the existence of a conspiracy more credible to the jury.

## III.

### A.

To evaluate plaintiffs' contention that the trial court erred in granting a directed verdict for defendants, it is necessary to determine the elements of a *prima facie* case on which plaintiffs were required to present sufficient, admissible evidence.

In their complaint, plaintiffs alleged that defendants had conspired with the bricklayers' and laborers' unions to impose the multi-trade/multi-employer collective bargaining agreement's terms upon smaller non-signatory employers in an attempt to drive them out of business in violation of section 1 of the Sherman Act. By seeking to apply antitrust laws to an agreement reached under provisions of the labor law,[9] plaintiff's complaint illustrates and raises questions of an inevitable, basic tension between two firmly established national policies. On one hand, labor law favors collective bargaining and agreements limiting competition for labor. Antitrust law, on the other hand, promotes competition and declares illegal those agreements which unreasonably restrict commerce. To reconcile these conflicting policies and to protect unionism and collective bargaining from destruction under the guise of antitrust law enforcement, both Congress and the courts have created exemptions to antitrust law for labor activity.[10] Although some areas of the antitrust-labor interface may remain unclear, the Supreme Court in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) addressed allegations substantially the same as those made by plaintiffs in the present case and refined the scope of the labor exemptions.

In *Pennington*, a small coal company alleged that the UMW had agreed with a multi-employer group of large mineowners to cooperate in a variety of tactics to drive smaller coal companies out of business. In furtherance of this purpose, the UMW agreed with the multi-employer group to establish a uniform wage rate for all coal companies, a rate higher than that which the small companies could afford. The UMW argued that this agreement was exempt from the antitrust laws because it dealt with wages, a mandatory subject of bargaining under labor law. Justice White, in the opinion of the Court, rejected this argument and stated:

> [W]e think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of

9. In multi-employer/multi-union bargaining, the employers agree to bargain as a group, as do the unions. The duty to bargain in this type of arrangement has been enforced by the National Labor Relations Board under section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. § 158(b)(3). *See, e.g., Local 260, Wood, Wire and Metal Lathers International Union*, 228 NLRB No. 179 (1977).

10. The "statutory" exemption was created by Congress in sections 6 and 20 of the Clayton Act, 15 U.S.C. §§ 17 and 29 U.S.C. § 52, and in the Norris-La Guardia Act, 29 U.S.C. §§ 101 *et seq*. This exemption can only be asserted by a labor organization itself and will be lost if the union combines or conspires with a non-union group to restrain trade. *See, e.g., Allen Bradley Co. v. Local No. 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The "non-statutory" exemption was created by the Supreme Court to exempt agreements between unions and employers. These agreements are not exempt under the statutory exemption because the unions are not acting unilaterally, but the Court has concluded that they should be exempt nevertheless as "a proper accommodation between congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets." *Connell v. Plumbers and Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Because defendants in the present case are *not* labor organizations, they could not assert the statutory exemption. Employers, however, as well as labor unions, have successfully raised the nonstatutory exemption for provisions arising from collective bargaining. *See McCourt v. California Sports, Inc.*, 600 F.2d 1193 (6th Cir. 1979); *Mackey v. National Football League*, 543 F.2d 606, 612 (8th Cir. 1976), *cert. dism'd.*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

employment from the remaining employers in the industry.

381 U.S. at 665–66, 85 S.Ct. at 1590–91. Similarly, in the instant case plaintiffs' allegation that defendants agreed with unions to impose a wage scale upon plaintiffs would, if proved, prevent the use of a labor exemption by defendants.

In *Federal Maritime Commission v. Pacific Maritime Association*, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978), the Supreme Court cautioned that the question of antitrust liability must be analyzed separately from that of non-exemption:

> It is plain from our cases that an antitrust case need not be tried and a violation found before a determination can be made that a collective-bargaining agreement is not within the labor exemption, just as *it is clear that denying the exemption does not mean that there is an antitrust violation.*

435 U.S. at 61, 98 S.Ct. at 939 (footnote omitted) (emphasis added). Thus, although proof of an agreement between defendants and the unions to impose a wage scale on plaintiffs would eliminate any claim of a labor exemption from the antitrust laws, a determination of the elements of an antitrust violation requires further analysis.

This court has considered the antitrust implications of extra-unit wage agreements in a series of cases involving the coal industry.[11] Following the Supreme Court's decision in *Pennington*, we had our first occasion to address the requirements for proof of antitrust liability in *Lewis v. Pennington* (*Pennington II*), 400 F.2d 806 (6th Cir. 1968). Judge Peck examined the opinions of Justices White and Douglas, and concluded that the Sherman Act made illegal "a conspiracy between employers and labor *formed with the intention of driving competitors out of business ....*" 400 F.2d at

814 (emphasis added). Later, in *Ramsey v. United Mine Workers* (*Ramsey I*), 416 F.2d 655 (6th Cir. 1969) (*en banc*), *rev'd on other grounds*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971), the court split evenly on the issue whether elements of the antitrust violation had to be established by "clear proof." The opinions of Judge Edwards and Judge O'Sullivan, however, both quoted Judge Peck from *Pennington II* regarding predatory intent, and neither opinion expressed any disagreement with this need for a showing of anticompetitive purpose. 416 F.2d at 655 and 673. In *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767 (6th Cir. 1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971), we summarized our prior decisions in *Pennington II* and *Ramsey I* regarding antitrust liability that could arise when a labor union has agreed with an employer to impose a wage scale on non-signatory employers:

> [I]f this agreement was made or entered into by the union in pursuance of its own self interests, there are no grounds for concluding a violation of the antitrust laws.... [I]f, however, the employers and union entered into this contract *with the conscious knowledge or intent that it would be used to drive competitors out of business* (more than the incidental effects caused by the adoption of a uniform wage agreement which may result in certain operators not being able to function profitably), then a violation of the antitrust laws has occurred.

434 F.2d 782 (emphasis added).

After *South-East Coal*, the Supreme Court held in *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971), that the ordinary preponderance standard, rather than clear proof, should be applied in antitrust actions against unions. Although the Court did not specifically address the issue whether predatory intent

---

11. *Pennington v. United Mine Workers* (*Pennington I*), 325 F.2d 804 (6th Cir. 1963), *rev'd.*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Lewis v. Pennington* (*Pennington II*), 400 F.2d 806 (6th Cir. 1968), *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968); *Ramsey v. United Mine Workers* (*Ramsey I*), 416 F.2d 655 (6th Cir. 1969), *rev'd.*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); *Ten-*

*nessee Consolidated Coal Co. v. United Mine Workers*, 416 F.2d 1192 (6th Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970); *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767 (6th Cir. 1970); *Ramsey v. United Mine Workers* (*Ramsey II*), 481 F.2d 742, *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973).

was a requirement to a finding of antitrust liability, Justice White stated:

> Where a union, by agreement with one set of employers, *insists on maintaining in other bargaining units specified wage standards ruinous to the business of those employers*, it is liable under the antitrust laws for the damages caused by its agreed-upon conduct.

401 U.S. at 313, 91 S.Ct. at 665 (emphasis added). Upon remand, the district court stated that the above quoted language from *Ramsey I* allowed proof of a *per se* violation without the need to show predatory intent, *Ramsey v. United Mine Workers*, 344 F.Supp. 1029, 1033 (E.D.Tenn.1972). On appeal, this court in an opinion by Judge Edwards affirmed the decision that a conspiracy had not been proved, and rejected Ramsey's claim of a *per se* violation. *Ramsey v. United Mine Workers* (*Ramsey II*) 481 F.2d 742 (6th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed. 28 (1973).

Although the dictum of Justice White in *Ramsey* could conceivably be read broadly enough to substitute harmful effect for predatory intent as an element of the antitrust violation, we decline to do so for a number of reasons. Most important, an elimination of the predatory intent requirement would be inconsistent with the concurring opinion in *Pennington*, which provided a limitation on the Court's decision. *See United Mine Workers v. Pennington, supra*, 381 U.S. at 673, 85 S.Ct. at 1585 (Douglas, J., concurring) (requiring that the agreement be made "for the purpose of forcing some employers out of business"); *Lewis v. Pennington, supra*, 400 F.2d at 814 (holding that a majority of the Supreme Court in *Pennington* required a finding of predatory intent). There is no other indica-

tion in *Ramsey*, however, that the Court intended to expand the scope of liability that it set forth in *Pennington*. Moreover, in *Ramsey II*, we implicitly rejected the idea that a *per se* antitrust violation could exist based on proof of an agreement but without proof of predatory intent. *See* P. Areeda and D. Turner, I Antitrust Law 208 n.71 (1978). Where legitimate union agreements with multi-employer groups will always reduce some competition over wages, the requirement of predatory intent is necessary to limit the application of the antitrust laws to truly anticompetitive behavior between firms in an industry.

Other circuits have held that predatory intent is a necessary element for an antitrust violation arising from a union's commitment to employers to establish an industry-wide wage scale. In *Smitty Baker Coal Co. v. United Mine Workers*, 620 F.2d 416 (4th Cir. 1980), the Fourth Circuit made an extensive review of the decisions of our court and concluded:

> It would appear established beyond controversy by these Sixth Circuit decisions . . . that for an agreement between the Union and the multi-employer group to constitute an antitrust violation it must arise out of a predatory intent. . . .

620 F.2d at 431. In addition, the Fifth and Seventh Circuits have required a showing of anticompetitive purpose. *Embry-Riddle Aeronautical University v. Ross Aviation, Inc.*, 504 F.2d 896, 903 (5th Cir. 1974); *Associated Milk Dealers, Inc. v. Milk Drivers' Local 753*, 422 F.2d 546, 554 (7th Cir. 1970). We also note that many commentators have voiced approval of this requirement.[12]

■ Therefore, we conclude,. after a review of Supreme Court decisions, cases from this circuit and other circuits, and the

---

12. *E.g.*, Handler and Zifchak, *Collective Bargaining and the Antitrust Laws; The Emasculation of the Labor Exemption*, 81 Col.L.Rev. 459, 509–10 (1981); Leslie, *Principles of Labor Antitrust*, 66 U.Va.L.Rev. 1183, 1209 (1980) ("the imposition of an industry-wide wage rate is an inherently ambiguous action. Only 'predatory intention' distinguishes the lawful tactical objective from the unlawful") St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law*, 62 U.Va.L.Rev. 603, 611 (1976) ("the presence of a predatory purpose" should be the

"critical factor" in a *Pennington* type case); Cox, *Labor and the Antitrust Laws: Pennington and Jewel Tea*, 46 Boston U.L.Rev. 317, 324 (1967) ("the *Pennington* case will be confined to situations in which there is a rather specific agreement to put some of the employers in the industry out of business"); P. Areeda and D. Turner, I Antitrust 211 (1977) (agreements creating industry-wide wage uniformity should not be considered improper unless reached "for the purpose of destroying . . . other firms.")

literature in the antitrust-labor area, that plaintiffs in the present case had the burden of proving first that defendants and unions agreed to impose wages upon plaintiffs, and second that defendants entered into this agreement with the intent to injure the plaintiffs' businesses, *i.e.*, with predatory intent.

### B.

As an initial basis for the directed verdict, the district judge held that plaintiffs had not presented sufficient evidence on the first element, the existence of an agreement or conspiracy. Applying *Enright* (properly, as we have determined in part II of this opinion), the district court excluded the hearsay statements after making a factual finding that appellants had failed to prove the existence of a conspiracy by a preponderance of the evidence.[13] With the *Enright* statements excluded, the district court determined that a rational jury could not find the existence of an agreement or conspiracy based on the remaining evidence. In an informal ruling from the bench, the district judge concluded that while there may have been proof of a conspiracy or agreement *among the union people themselves* to negotiate the same wage rate with plaintiffs as had already been obtained from defendants, there was insufficient admissible evidence of any agreement or conspiracy *between the unions and defendants* to submit that issue to the jury.

> I do not find as a fact that there was an agreement between the employer groups and the Union groups that the unions would not enter into an agreement at a different economic package. I think

there is a strong expectation and, as I say, Mr. Dailey's telegram causes me to have some concern but weighed against all the other facts, I do not find [the agreement] to be a fact.... [T]hen under the *Enright* case, the most damaging evidence that could go to the jury comes out with it and it would have to be a directed verdict.

Trial Transcript at 1173. We agree with the trial judge that plaintiffs did not present sufficient admissible evidence on the issue of an agreement between defendants and the unions to avoid a directed verdict.

By its language, section 1 of the Sherman Act [14] applies to three different types of conduct: contract, combination, or conspiracy. These terms have been interpreted generally to cover concerted action, or agreement by parties to act together.[15] To prove a section 1 violation plaintiffs must present evidence of mutual action, evidence that the union acted at the behest of the defendants and not merely according to an independent course of action.

In examining the record for evidence of an agreement, we recognize that "explicit agreement is not a necessary part of a Sherman Act conspiracy." *United States v. General Motors*, 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). Concurring in *Pennington*, Justice Douglas emphasized this point:

> "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is suffi-

---

**13.** In making his *Enright* determination that plaintiffs had not proved a conspiracy or agreement by a preponderance of the evidence, the trial judge followed this court's decision in *United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979), and properly considered all the evidence, including the hearsay statements. Although plaintiffs have challenged the standard of proof applied by the trial judge, they have not claimed, and we would be unable to hold, that despite applying the proper legal standard the judge's factual determination was clearly erroneous.

**14.** Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ....
> 15 U.S.C. § 1.

**15.** "[Section 1] presents a single concept about common action, not three separate ones: 'contract * * * combination or conspiracy' becomes an alliterative compound noun, roughly translated to mean 'concerted action.' ... [T]he core of the classic offense is mutual assent, a mutual committment to an anti-competitive course, ..." L. Sullivan, Antitrust 312 (1977).

cient to establish an unlawful conspiracy under the Sherman Act."

381 U.S. at 673 n.*, 85 S.Ct. at 1595 n.* quoting Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Yet it is also true, as Justice White wrote for the Court in Pennington, that mere proof of unilateral union action alone does not permit an inference of a conspiracy with an employer group:

Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy. There was, of course, other evidence in this case, but we indicate no opinion as to its sufficiency.

381 U.S. at 665 n.2, 85 S.Ct. at 1590 n.2.

In South-East Coal, this court was faced with similar factual allegations regarding a conspiracy or agreement between employer and unions and set forth the standard for granting a directed verdict:

[I]f a plaintiff does not come forth with evidence, when considered in light of opposing evidence, from which a jury could infer the truth of an alleged proposition over its contra-proposition, the plaintiff has not met his burden of proof. When there are equal inferences which can be drawn from a particular set of facts—one inference indicating liability, the other non-liability—it is the judge's obligation at the direct verdict stage of the trial to find for the defendant.

434 F.2d at 777 (footnote and citations omitted) (emphasis added).

Without the excluded hearsay statements, the jury would be left with only the following evidence: a fully lawful collective bargaining agreement existed between the unions and the defendants; the unions attempted to obtain a similar package from the plaintiffs ($2.00 raise over two years); the bricklayers settled with the plaintiffs for $2.00 over two years, while the laborers settled at $3.15 over three years; the defendants hoped and expected that their contract with the unions would set a pattern for the industry;[16] and one of the defend-

---

16. On direct examination by the plaintiffs, Mr. Dailey, a defendant and president of the AGC, testified:

[plaintiffs' attorney]
Q: Was it your belief at the time that the other unions with whom you had not negotiated would follow the pattern set in this multi-bargaining?
[Mr. Dailey] ·
A: I'm sorry, was it our belief that the other unions would follow the pattern set?
Q: The unions not included here would follow the pattern that was established during the course of that bargain?
A: We had no idea whether the other unions would follow the other pattern but I think everybody at the table realized since all construction bargaining is pattern bargaining that there would be a great precedent set by this settlement that in effect would form a pattern for subsequent bargaining and it was the hope of everybody there that the trades and the employer associations not represented in that multi-trade session would consider it as a pattern and not exceed it by any great amount of money, because if they had we wouldn't have been able to get our settlement ratified.

Trial Transcript at 777–78.

Also, Mr. Veighey, a defendant negotiator for CEC, testified in a deposition that was read into the record at trial:

[plaintiffs' attorney]
"Q: Do you recall any members of the employer group, employer representatives raising a similar type of question as to the impact on multi-trade bargaining if any of the unions settled with other employers who were not represented in different terms?
[Mr. Veighey]
"A: No, I don't recall any employer representative making any comment to that extent at all. The general feeling in the meeting from the outset was one of pretty good faith. I sat in on a lot of negotiations and I never experienced the attitude that seemed to be prevalent at this meeting, rather a certain amount of sincerity both on the management side and the union side all through the meeting. Even though we were in disagreement

ants, Mr. Dailey, director of the AGC, sent a telegram to the unions following the unions' settlement with the plaintiffs asking for a meeting regarding the unions' settlement with plaintiffs.[17]

■ Evidence that the unions sought the same wages from two sets of employers is not sufficient to prove a conspiracy between the unions and one employer group. The unions could have been pursuing the wage scale because of an agreement with defendants; however, it would be at least equally probable to a reasonable jury that the unions were pursuing their own policy, unilaterally reached, that they would not jeopardize their standing with their memberships by agreeing to less favorable conditions for the remaining members of the union than those which they had already negotiated in collective bargaining with defendants. Such a policy, adhered to by the unions, cannot and ought not stand as evidence of an unlawful conspiratorial agreement. There must be, to evidence such an agreement, some other facts from which the jury could properly conclude to the contrary. This requirement, though subtle, is critical to any proper accommodation of the nation's labor and antitrust laws. Otherwise, every union adherence to a bargaining position which had previously been successful in earlier negotiations could make the union and the employer subject to liability under antitrust laws for what was a fully lawful collective bargaining stance.

The evidence could have convinced a rational jury that the defendants hoped their settlement with the unions would set a pattern in the industry. It is not surprising that defendants would not want to be competitively injured by the collective bargaining agreement and would hope possible competitors would not be able to obtain labor at a cheaper rate. Of vital concern to all businesses is their competitive position *vis a vis* the rest of the industry.[18] In

on subjects but the employers did not make any kind of comment.

\* \* \* \* \* \*

"Q: My question is: How did good faith relate to your not bringing this matter up to the union?

"A: I suppose because we kind of trusted them. They would try to do their thing and we definitely were going to try to do ours.

"Q: You trusted them to do it?

"A: To do whatever they were going to do in negotiations. Apparently a plateau had been established in every year of negotiations that we ever met. We always had some number out there somewhere by somebody to look at, some carry over contract or something. One of the union fellows, I don't know who it was, but one of them, anyhow, came from this side of the table and made the comment that it would establish a plateau and that was not out of line, so far as I am concerned, because in other years we had faced other plateaus, common language in our industry.

"Q: You say this would establish a plateau. Would this plateau mean in labor terminology basis for settlement with other employers?

"A: At least it was something to aim at. They could go higher than that if they wanted to. They could do whatever they wanted to in their negotiations. I guess we were trusting each other, we would try to encourage more people to come into future multi-trade bargaining. That is why good faith does have some reference to the whole thing.

\* \* \* \* \* \*

"Q: Do you mean you were trusting them not to settle with other employer groups on better and different terms?

"A: Just trusting them not to upset the apple cart in whatever area they would do it." Trial Transcript at 1024–27.

17. The telegram was sent by Mr. Dailey to Jack Wood, secretary and business manager of the Detroit Building Trades Council (an association of construction unions), on May 25, 1970 shortly after the DMAC settled with the union for $3.00 over 3 years. It stated:

"We request a special meeting of the negotiating committee, parties to the multi-trade agreement. We suggest that the committee meet at the Detroit Building Trades Office on Wednesday, May 27th at 2:00 P.M. Subject is the recent ... settlement of a contract between Detroit ... Mason Contractors Association and Laborer's Local 334 Local 1076. Please advise."

Signed Thomas E. Dailey, President, Construction Employers Council.

Trial Transcript at 849.

18. Labor law commentators have also indicated that in the reality of collective bargaining employers always have a concern about the wages their competitors pay. Professor St. Antoine writes: "it is simply unrealistic to insist that an employer has no valid interest in the union wage scale to be paid by the employer's competitors." St. Antoine, *supra*, note 12, 62 U.Va.L.Rev. at 610. In the same vein, Professor Leslie commented: "it is virtually inevitable that the bargaining process will include at

*Ramsey v. United Mine Workers,* 481 F.2d 742 (6th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973), our court confronted the argument that an agreement with the unions could be inferred because the employers had a competitive motive to standardize wages throughout the industry:

> As regards any inference to be drawn from a competitive motive on the part of [the defendant employers group], . . . it is apparent that in a competitive economy a competitive motive will be universal to all coal producers. To draw an inference of antitrust conspiracy from this motive would be somewhat of an anomaly.

481 F.2d at 746. In the present case, plaintiffs brought out no admissible evidence that defendants' "concern" regarding future wage settlements with other units was ever communicated to the union. The evidence showed that defendants expected the settlement to set the pattern, but it could not be used by a jury to reach the conclusion that the union agreed or conspired with defendant to help set the wage scale.

Admittedly, we are concerned by the telegram sent by defendant Daily to the unions following plaintiffs' contract settlement with the unions. This is the *only* evidence that links what otherwise would be two independent parties pursuing their own interests: the unions hoping to obtain equal treatment for all their members and the defendants hoping not to be competitively injured by the bargaining agreement. Plaintiffs assert that defendants would want a meeting with the unions following the plaintiffs' agreement with the unions only if the unions had breached a prior agreement with defendants regarding the wages that the unions would seek. We are not convinced, however, that this telegram, when added to the evidence of a completely legal pattern of bargaining by its union, is enough additional evidence to allow a jury to find an agreement. In making this de-

termination, we find it important that there was no evidence that the meeting proposed in the telegram ever took place; that the evidence showed the defendants had a legitimate concern whether the unions' settlement with plaintiffs would affect ratification of the pact reached by unions and defendants; and that the telegram was sent after, not before, the union negotiated with defendants. We disagree with plaintiffs' contention that a jury could find a conspiracy based on evidence of pattern bargaining and an after-the-fact telegram, to which a response was never made.

### C.

Assuming *arguendo* that there was sufficient evidence of an agreement, we are equally convinced that the directed verdict should be affirmed on the alternate, independent ground that plaintiffs failed to produce sufficient admissible evidence on the second element of their antitrust claim, predatory intent. The trial judge ruled:

> About the competition, I don't think you have enough to go to the jury that there was any intent on anyone's part to harm the Plaintiffs as a group. . . . I certainly don't find any motivation or intent on the part of any of these people to hurt anybody from a competitive point of view.

Trial Transcript at 1174–75.

■ Although Mr. Snyder, one of the plaintiffs, testified he had been upset with the defendants because of prior collective bargaining experiences, the evidence did not show any ill will on the part of the defendants, or any intent to drive plaintiffs out of business. As evidence of *defendants'* bad intent, plaintiffs only point to the testimony of defendant Veighey. Mr. Veighey stated that, during the collective bargaining between the defendants and the unions, the employers had caucused and discussed the possible impact of the wage package on employers who were not represented during the bargaining.[19] Mr. Veighey's testimony

---

least some discussion of whether the union intends to demand a uniform wage rate from all employers." Leslie, *supra,* note 12, 66 U.Va.L. Rev. at 1209 n.89. In the instant case, the evidence indicated that the defendants were concerned about setting a pattern, but there

was no evidence that they presented this to the union.

19. In a deposition that was read into the record Mr. Veighey stated:

> [plaintiffs' attorney]

certainly would support a finding that defendants considered other employers, but this very limited proof is far from sufficient to support an inference that defendants wanted to drive plaintiffs out of business. Rather, Mr. Veighey said that defendants discussed the other employers because they did *not* want to hurt those employers by the wage pattern which might be set. There is simply no evidence in the record from which a reasonable jury could reach a different conclusion regarding defendants' motive or intent.

The record could support a finding that defendants' reason for standardizing wages was to protect the multi-trade/multi-employer bargaining concept. If unions or employers signed more attractive agreements after the multi-trade/multi-employer agreement had been agreed to, this would jeopardize ratification of the earlier pact and might discourage parties from participating in further multi-trade negotiating. This concern with the bargaining structure of the industry is very different from the predatory intent alleged in *Pennington* and presents few of the competitive dangers. Our analysis of the *Pennington* case and the standard of antitrust liability set forth later by the courts convince us that bare proof of an intent to protect multi-trade bargaining cannot be the basis for imposing antitrust liability.

On appeal and cross appeal, the judgment of the district court is affirmed.

"Q: You mean you were discussing among yourselves what might happen if employer groups who were not present might settle for different periods of time at different amounts?
"A: No.
"Q: What do you mean by evaluation? What were you trying to evaluate with regards to groups that were not there?
"A: Frankly, we did not want to hurt anybody. We did not want to set up some sort of a situation that would hurt somebody.
"Q: What do you mean? How could the situation you were setting up hurt someone else?
"A: Well, as history indicates, there were employers that did not agree with our settlement.
"Q: At that time until the caucus in terms of what you were discussing, how could what you did hurt someone else?

"A: We came to the conclusion that it would not. We came to the conclusion because we were establishing a new concept of bargaining and everything that that contract had in it, arbitration, everything else and to pay the price that we had to pay to get that contract, plus faced with a carry over contract for a greater amount, we did not think we could do any better on our own or we did not think that others could, at least it was our opinion that others could not do any better on their own.
"Q: Is it fair, then, to say you came to the conclusion that that particular agreement would be good for the other employer groups as well as your own?
"A: It was our sincere hope that our decision would do that, right."
Trial Transcript at 1034–35.